AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. 4:21-mj-71274-MAG |
| Troy Elias Walker, David Michael Rembert, and Daljit Kamal Singh, | ) ) ) | **FILED UNDER SEAL** |
| *Defendant(s)* | ) | |

**FILED**
Aug 10 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of October 1, 2020 to August 9, 2021 in the county of Contra Costa in the Northern District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 922(a)(1)(A) | Conspiracy to Deal Firearms Without a License |

Maximum Penalties: maximum term of 5 years imprisonment; $250,000 fine; 3 years supervised release; forfeiture

This criminal complaint is based on these facts:

Attached Affidavit of Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Special Agent Dillon Phillips

☐ Continued on the attached sheet.

Approved As To Form:

*Jonathan U. Lee*
AUSA JONATHAN U. LEE

*Dillon Phillips*
*Complainant's signature*

Dillon Phillips, ATF Special Agent
*Printed name and title*

Sworn to ~~before me and signed in my presence~~ before me over the telephone pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: 08/10/2021

*Virginia K. DeMarchi*
*Judge's signature*

City and state: San Jose, California

Hon. Virginia K. DeMarchi, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Dillon Phillips, a Special Agent with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, state:

## I. INTRODUCTION

### A. Purpose of Affidavit

1. I submit this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a complaint charging and arrest warrants authorizing arrests of the following individuals: Troy Elias WALKER ("WALKER"), David Michael REMBERT ("REMBERT"), and Daljit Kamal SINGH ("SINGH") for one count of Conspiracy to Deal Firearms Without a License, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A), beginning on a date unknown, but no later than in or about October of 2020 (when Antioch Police Department began monitoring the dippin_sideways Instagram account), and continuing through at least August 9, 2021 (when I last observed a post on the dippin_sideways Instagram account, advising their customers that the package containing the items they ordered has not yet arrived), in the Northern District of California and elsewhere.

### B. Sources of Information

2. I have based my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and/or law enforcement officers, information gathered through law enforcement surveillance efforts, information provided by photographic and/or video-recorded evidence, information obtained through search warrants of social media or other accounts, and information provided by records and databases, as well as other sources. I believe these sources to be reliable. To the extent information is obtained through confidential informants, their reliability will be addressed separately herein. Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds. Where statements made by other individuals are referenced in this Affidavit, such statements are described in sum and substance and in relevant parts only. Similarly,

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

1

where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part only.

## II.     AFFIANT BACKGROUND AND EXPERIENCE

3.     I have been employed as a Special Agent ("SA") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since May 2020. I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program and the ATF National Academy Special Agent Basic Training Course.  My duties include the investigation of criminal violations of federal firearms, explosives, and arson laws, as well as those involving violent crime. Prior to being an ATF Special Agent, I was employed as a police officer with the Kansas City, Missouri Police Department from May 2012 to May 2020. During my employment with the Kansas City, Missouri Police Department, I was assigned to the Patrol Bureau as a patrol officer, the Narcotics and Vice Division as an undercover narcotics detective, and to the Patrol Bureau as a tactical response team officer.

4.     As an ATF Special Agent, I have conducted and participated in both state and Federal investigations involving the trafficking of firearms and distribution of controlled substances.  I have investigated and assisted in the prosecution of criminal street gangs engaged in illegal narcotics and firearms trafficking.  During these investigations, I have become familiar with various investigative techniques, including electronic surveillance, the use of undercover agents and informants, and controlled purchases of firearms and narcotics from suspects. I have participated in investigations as an undercover agent purchasing firearms and narcotics from suspects.  I have also participated in physical surveillance operations and the execution of state and federal arrest warrants and search warrants, resulting in state and federal prosecution of defendants.  In addition to utilizing the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record searches, pen registers and trap-and-trace devices, cell phone cell-site data, precision cell phone location data, utility records, and telephone toll and subscriber records. My work with informants and cooperators has involved, among other things, monitoring meetings and recorded conversations, and generally evaluating the reliability and truthfulness of an informant/cooperator.  Because of my training and experience, I have become familiar with the manner

in which illegal firearm and drug traffickers smuggle, transport, store, conceal and distribute firearms and drugs, as well, as how they collect and launder proceeds related to such activities.  I am also familiar with the manner in which these individuals use telephones, coded communications, false or fictitious identities, and other means to facilitate illegal activities and thwart law enforcement investigations.  I have also consulted and discussed the investigations with other law enforcement officers and agents who are experienced in these types of investigations.

5. I am an investigative or law enforcement officer of the United States, within the meaning of Title 18 United States Code, Section 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

6. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrants for the three individuals named herein, I have not included every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that beginning on a date unknown, but no later than in or about October of 2020, and continuing through at least August 9, 2021, in the Northern District of California, WALKER, REMBERT, and SINGH agreed with each other and with others to deal in firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A).

**III.   APPLICABLE LAW**

7. Under 18 U.S.C. § 371, it is unlawful for two or more persons to conspire either to commit any offense against the United States, and one or more of such persons do any act to affect the object of the conspiracy.  The elements of this violation are as follows: (1) an agreement between two or more persons to commit at least one of the charged crimes; (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it and; (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

8. Under 18 U.S.C. § 922(a)(1)(A), it is unlawful for anyone who is not a licensed dealer to engage in the business of dealing in firearms.  The elements of this violation are as follows: (1) the defendant willfully engaged in a business of dealing in, importing, or manufacturing firearms within the

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
**[UNDER SEAL]**
3

dates specified; and (2) the defendant did not then have a license as a firearms dealer, importer, or manufacturer.[1]

## IV. FACTS ESTABLISHING PROBABLE CAUSE

### A. Overview of Investigation

9. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is investigating firearms trafficking conducted via Instagram[2] and in-person by of a group of individuals, including WALKER, REMBERT, and SINGH (collectively, the "Defendants"). Through the investigation, law enforcement conducted undercover buys of 13 firearms and 17 Glock conversion switches[3] collectively from the Defendants. The purchased firearms included privately made firearms (i.e., "PMF"[4]) and commercial/factory firearms. A Glock switch is a device that modifies a Glock-style pistol it shoots

---

[1] A defendant must be engaged in a greater degree of activity than the occasional sale of a hobbyist or collector, and the defendant must devote time, attention, and labor to selling firearms as a trade or business with the intent of making profits through the repeated purchase and sale of firearms

[2] Per news reporting, Instagram has no explicit policy prohibiting the sale of firearms on its platform.

[3] I know that a "switch" is a conversion device constructed from a machined, three-piece, metallic Glock-type back plate, a metal "leg," and a metal "selector" rod. The back plate houses the leg and selector rod, which is designed to enable the pistol to fire in either semi-automatic or automatic machinegun mode. The "switch" functions by using the forward extending metal leg to push the trigger bar down and out of engagement with the firing pin as the slide closes, thereby allowing the firing pin to travel forward and fire a round of ammunition.
I know Glock conversion switches to be machine gun conversion devices, which are specifically used to convert a semi-automatic Glock pistol to a firearm that fires automatically, a machine gun, as defined further below. For the purposes in this affidavit, the aforementioned machinegun conversion device will be referred to as a "Glock conversion switch." I know from training, experience, and consultation with other law enforcement officers that Glock manufactures certain models of machine gun pistols; however, Glock does not manufacture machine gun conversion devices for sale to the general public.
According to the Gun Control Act of 1968 (GCA), 18 U.S.C § 921(a)(23) defines the term "machinegun" as the following: "has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C 5845(b))." The National Firearms Act (NFA), 26 U.S.C § 5845(a), defines the term "firearm" to include "… (6) a machinegun:…" Also, the NFA 5845(b) defines "machinegun" as the following: "…any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in possession or under the control of a person." Consistent with the federal laws described above, the Glock automatic switches described in this affidavit are machine guns.

[4] "PMF" is an ATF term used for identifying firearms that have been made from unfinished receivers and that are absent manufacturer's marks of identification.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

4

multiple rounds automatically when the trigger is depressed without manual reloading, i.e., it fires multiple rounds in rapid succession by a single function of the trigger.

### 1. WALKER's Role and Use of Instagram

10. As detailed below, law enforcement identified WALKER as the primary user of two Instagram accounts with usernames "dippin_sideways" and "alpha_armoury" (collectively, the "Instagram Accounts".) Instagram is a social media platform that allows users to share videos and photographs, as well as public post comments and direct message other users. Agents have determined the Instagram Accounts are used to market firearms, ammunition, high-capacity magazines, machineguns, and at least one silencer for sale. Through a historic review of the two Instagram Accounts associated with WALKER, I have observed over 100 postings of firearms, firearm parts, ammunition, and magazines from about April of 2021 to August 9, 2021.[5]

11. As detailed below, the investigation has revealed that the Instagram Accounts are used to market and sell firearms within Contra Costa County and elsewhere in the San Francisco Bay Area, as well as other states. Below are two examples of posts from the Instagram Accounts, including one which purports the depict firearm for a customer in Illinois:



---

[5] It should be noted that some of the posts and/or items posted may be duplicate postings.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

5



**2.    REMBERT Manufactures Firearms, SINGH Sources Glock Switches and Both Men Work with WALKER to Traffic Firearms**

12.   As further detailed below, investigators identified REMBERT as an associate of WALKER's and involved in manufacturing homemade firearms marketed/sold via the Instagram Accounts. Investigators further determined that SINGH is a source of Glock conversion switches and associate of WALKER's in the firearms trafficking business.

**B.    The Defendants Are Not Licensed Firearms Importers, Manufacturers, or Dealers**

13.   As an ATF Special Agent, I have access to the licensing records of persons engaged in the business of importing, manufacturing, or dealing in firearms. I know that neither WALKER, REMBERT, or SINGH are licensed to engage in the business of importing, manufacturing, or dealing in firearms.

**C.    Identification of the First Instagram Account**

14.   In approximately April of 2021, a sergeant with the City of Antioch Police Department ("APD") advised me that he had been monitoring an Instagram account called "dippin_sideways" (hereafter, the "Instagram Account"). Among other posts, the sergeant observed a picture depicting a

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]
6

vehicle bearing California license plate #XXXX015. The sergeant further provided numerous screenshots of several firearms posted as available for purchase on the Instagram page.

15. In an effort to identify the user of the "dippin_sideways" account, I conducted a query of the California Department of Motor Vehicles (DMV) of the license plate #XXXX015. I know that individual users of social media will often post photographs of themselves, their belongings, and/or their residences. Here, I discovered the vehicle was registered to Troy Elias WALKER (i.e., WALKER), with an address of 1257 Redwood Drive, Concord, CA 94520.

16. With the assistance of APD and the CI, through the course of the investigation, I observed posts made by the user of the Instagram Account. The posts included photographs and/or video of various firearms for sale, as well as Glock Conversion Switches (Machineguns). On or about June 14, 2021, I obtained a federal search warrant for the Instagram Account and later obtained data from the social media provider on or about June 29, 2021. My review of the messages and posts indicated the user of the account was arranging firearms transactions with various individuals.

### D. ATF Identifies WALKER as the User of the Instagram Account and Conducts Undercover Firearms Purchases from the Defendants

17. In mid-April 2021, an ATF agent instructed an ATF Confidential Informant (hereafter, the "CI")[6] to cold contact the Instagram Account and attempt to arrange for the purchase of a firearm. At the direction of law enforcement, the CI exchanged direct messages with the user of the Instagram Account (later identified as WALKER) to arrange the purchase an AR-15 style firearm for $1,500. Leading up to the transaction, WALKER provided the meeting location: 1279 Linden Drive, Concord, California (hereafter, "1279 Linden Dr.").

///

///

---

[6] ATF CI is an individual who has worked for the ATF for an extended period and has received pecuniary payments for his/her assistance. Originally, the ATF CI began working in exchange for avoiding a potential non-fraud-related criminal charge. To date, the information provided to the ATF by ATF CI has been found to be credible and much of it has been corroborated, including through recorded conversations and phone records. A query of the ATF CI's criminal history was conducted utilizing NCIC, which returned no record of arrests or convictions.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

### 1. April 15, 2021: Firearm Transaction with REMBERT and WALKER

18. On or about April 15, 2021, an undercover agent (hereafter, "UC" or "UC-1") and the CI met with Troy Elias WALKER[7] and David REMBERT at 1279 Linden Drive, Concord, CA.[8] Upon arriving at the meeting location, the UC and the CI learned WALKER was the person communicating (through the Instagram Account) with the CI leading up to the transaction. During the meeting, WALKER and REMBERT sold the UC an AR-15 style rifle for $1,500. REMBERT accepted the money from the UC for the firearm. During the meeting, the CI asked WALKER to provide the CI with WALKER's phone number. WALKER advised the CI that he would send his number to the CI via Instagram. As the UC and the CI left the location, the CI received a message from the Instagram Account, which listed phone number XXX-XXX-2059. The CI and UC understood this phone number to belong to WALKER.

19. During this undercover meeting, WALKER and REMBERT informed the UC and the CI that they build firearms. Additionally, WALKER and REMBERT showed images of firearms (including homemade firearms) on their cell phones to the UC and the CI. During this meeting, WALKER informed the CI he had Glock "switches" (i.e., Glock Conversion Switches). WALKER explained the Glock switches cost $250 each.

20. During further conversation, the UC asked about future purchases of firearms. The UC asked if he/she should contact WALKER, should he/she want to put in an order for something specific. REMBERT confirmed the UC should contact WALKER. He explained WALKER would take the order from the UC, and the UC would then need to send them a deposit for the firearm, which would cover all the parts. Further, they would then order the parts, and they would let the UC know when the parts arrived. REMBERT explained the time frame with "shipping" would be about 2 to 4 weeks from the placement of the order to when the UC came to pick up the firearm. REMBERT explained that they build custom order firearms. REMBERT explained people pay for the firearms in advance and then

---

[7] Investigators later identified WALKER and REMBERT through DMV and/or known booking photographs, as well as based on their own stated names to the UC and others.

[8] All undercover transactions described in this Affidavit were surreptitiously recorded via audio and/or video device unless otherwise noted.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

8

they build them and "send them to them." REMBERT explained he "goes all over the place buying guns from all kinds of people…"

21.     Based on REMBERT's remarks, the UC's recorded transaction, and my review of the Instagram account, I believe REMBERT and WALKER were working together to run their stated custom-manufacturing firearms trafficking business, which includes sending firearms to customers located outside of the Bay Area.

### 2. April 21, 2021, Firearm Transaction with WALKER, REMBERT, UM-1, and SINGH

22.     In late April 2021, the CI contacted WALKER via the Instagram account and arranged for the purchase of a Glock-style handgun for $1,200. WALKER provided a photograph of the gun to the CI. On or about April 21, 2021, the UC and the CI met with WALKER, REMBERT, a third person (later identified as SINGH), and fourth unknown male (hereafter, "UM-1")[9] at 1279 Linden Dr. During the transaction, WALKER transferred the Glock-style handgun to the UC. The UC asked who he/she should pay for the firearm and WALKER directed the UC to pay UM-1. The UC paid $1,300 to UM-1 for the firearm.

23.     During the conversations, the CI asked the group if any other firearms were available. WALKER then turned to REMBERT and asked if he wanted to sell the UC and the CI anything. REMBERT explained that in about a week he would have two or three of "these" (which the UC and CI understood as a reference to the 1911 type semi-automatic handgun REMBERT was holding at the time of his remark). The CI asked how the process of purchasing the firearms would work. REMBERT explained, "…you tell us what you want, you drop a deposit, we order the parts." REMBERT further explained the buyer would pay for firearm and pick it up once completed. REMBERT stated the deposit could be paid through Cashapp or Venmo.[10] REMBERT explained that he can send the firearm to the

---

[9] Agents are continuing to investigate the identity of UM-1.

[10] Cash App and Venmo are payment services that allows users to transfer money to one another using a mobile phone application or "app."

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

9

UC/the CI, if needed, as they purported to reside outside of the Bay Area. WALKER and REMBERT explained they were shipping a 1911 handgun to a customer in the State of Illinois.

24.     Later, the CI asked WALKER how much the deposit would be for a Glock-style firearm; WALKER responded $800. WALKER added the CI would pay $400 at the end of the process which would bring the total cost to $1,200. WALKER explained the deposit would cover the cost and ordering of all the parts for the firearm. WALKER explained he only takes deposits, as he does not want to have paid for the parts himself and then suffer a loss when the customer does not return to purchase the firearm.

25.     During the meeting, the UC and the CI discuss obtaining Glock switches from WALKER. WALKER advised he would have to contact his source, in Vallejo, CA, in order to find out if there were any available for purchase. UM-1 interjected at this time and advised that he knew of a source who had Glock switches available, but they were priced high at approximately $500 or $600. The UC inquired with UM-1 about his ability to build and sell a Glock-style firearm with a Glock switch installed on it. UM-1 confirmed that he could build and sell a Glock-style firearm with a Glock switch installed on it, but that the UC would have to check with WALKER on the pricing. The UC asked UM-1 if everything went through WALKER, and he replied "yeah."

26.     Based on the UC's participation in the above-outlined conversation, as well as the investigation as a whole, I believe WALKER is responsible for running the marketing/sales side of the firearms trafficking operation through the Instagram Account and others, including UM-1, REMBERT, and SINGH, likely participate on the manufacturing/supply-side.

27.     Later during the same undercover operation, SINGH arrived at the location and introduced himself to the CI and the UC.[11] SINGH began to engage the other suspected co-conspirators in conversation about firearms during this time. In SINGH's presence, the CI asked WALKER about Glock switches. In turn, WALKER then asked SINGH about switches, which I believe is consistent with WALKER working with SINGH to supply/sell Glock switches. SINGH responded by offering to

---

[11] SIGNH was later identified through a California DMV photograph shown to the UC and CI.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
**[UNDER SEAL]**

sell the switch off of his firearm to the CI. The CI brought this offer to the UC's attention. The UC then also asked about purchasing the switch from SINGH. SINGH then produced a handgun from his waistband to display it to the UC and CI. The UC observed the firearm had a Glock switch installed on it. The UC attempted to purchase the firearm, but SINGH then advised that the firearm was not for sale. The UC again asked about purchasing a Glock switch and SINGH advised he could obtain them "all day." SINGH advised that he would sell the UC the Glock switch off of the firearm. Later, SINGH asked WALKER if he would come with him to the house. During this time, SINGH, WALKER, and UM-1 departed the residence.

28. A short time later, they returned to the location at which time SINGH advised that he had called to check "inventory" on Glock switches, and that the last one available at that time was the one on his Glock handgun. SINGH further explained his associate had informed him more switches were on back-order and they had to wait about three weeks to get the "rest of them." The UC understood SINGH's comments to mean that SINGH had a source of supply for more Glock switches, but more time was required to obtain them because they were allegedly out of their inventory. SINGH ultimately sold the UC a Glock conversion switch for $275. Further, SINGH also advised that he brought two more firearms to show the UC and the CI, as he heard they were doing good "business."

29. During the meeting, REMBERT installed the Glock conversion switch (purchased from SINGH) onto the Glock-style handgun that the UC had purchased from UM-1. Additionally, SINGH sold a Smith & Wesson Shield 9mm pistol for $1,150 and a Glock-style handgun for $1,200 to the UC.

30. Regarding the Smith and Wesson Shield firearm, the UC noted to SINGH that the S&W Shield did not have a visible serial number because it had been obliterated or obscured, as evident from the firearm's appearance. SINGH pointed to REMBERT and stated, "he did that for me." The UC understood SINGH to be conveying that REMBERT had removed the serial number. While the UC discussed this firearm with SINGH, REMBERT interjected and advised that the firearm previously belonged to him. Following the installation of the Glock switch, REMBERT and SINGH gave the UC specific instructions on the functionality of the Glock switch.

31. SINGH discussed the sale of more Glock switches with the UC. SINGH explained he could obtain four Glock Switches for the UC in the time frame of about two to three weeks. The UC asked SINGH if he should contact WALKER regarding this transaction. SINGH explained to the UC should go through WALKER to arrange this future transaction. Again, this direction is consistent with WALKER working with others to traffic firearms.

### 3. May 6, 2021: Firearm Transaction with WALKER, REMBERT, and another individual

32. In early May 2021, the CI communicated with WALKER via the Instagram Account, as well as text messages. WALKER informed the CI of multiple firearms available for purchase, including a custom-made Glock pistol (sourced by REMBERT for $1,700), a Glock pistol in the box (sourced from WALKER for $1,600) and four Glock switches (sourced from SINGH for $1,050). WALKER provided several photographs of the Glock conversion switches and firearms available for purchase to the CI via Instagram and text message.

33. On or about May 6, 2021, the UC and the CI met with WALKER, REMBERT, and a known female (hereafter, "F-1")[12] at 1279 Linden Drive. During the meeting, the UC purchased four Glock conversion switches from WALKER for $1,050, as well as a privately manufactured P80 firearm with a Glock slide (Caliber: 9mm, slide SN: YSZ617) for $1,050. The UC also purchased a Glock handgun which came with a Glock conversion switch (Model: 34, Caliber: 9mm, SN: BENF939) from REMBERT for $2,000—REMBERT installed the switch onto this firearm during the meeting. Also, the CI purchased a privately manufactured P80 firearm (Caliber: 9mm, S/N: N/A) from REMBERT for $1,700.

34. During the meeting, the UC asked WALKER if SINGH would be coming over. WALKER advised the UC that he already had the switches. The UC reminded WALKER that SINGH had told the UC that he was supposed to be getting a switch for free. Ultimately WALKER called

---

[12] F-1 is an individual whose identity is known to law enforcement. Not all of her statements, conduct and involvement have been set forth herein for the sake of brevity and because this information is not necessary to establish probable cause for this complaint.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

SINGH and let the UC speak to him on the phone. The UC recognized the voice of the person on the phone to be that of SINGH. SINGH explained the free switch would be coming with a firearm which hadn't been built yet. The UC asked SINGH if the price for the four switches was $1,050 and SINGH confirmed this.

35. During the meeting, the UC asked REMBERT if he could install the purchased Glock conversion switches on the two P80 handguns which were purchased. REMBERT agreed and stated the cost would be $50 for the installation of each switch. In their presence, REMBERT installed the Glock conversion switches on the two firearms. The UC paid REMBERT $100 for the installations.

36. The UC also asked if he/she could buy switches and WALKER confirmed that UC could do so. The CI then asked who had "rocket launchers." WALKER informed the CI about a three-round burst M-16, which had a grenade launcher and explained it cost $5,000. Later, WALKER then showed a picture from his phone to the UC and the CI of an AR-style rifle with a launcher type tube attached to the bottom of it.

37. While discussing the quality of firearms, REMBERT explained if a firearm does not work, then it does not leave here. REMBERT added he does not want the UC and the CI coming back with firearms that do not work; he wanted them to come back with more money. The UC understood that REMBERT wanted to continue doing business (i.e., selling firearms and Glock switches) with the UC and the CI.

38. While preparing one of the Glock frames for installation of a switch, REMBERT explained how he had previous training to learn how to do this type of work. REMBERT explained he had just failed so far to make it legit and legal. REMBERT explained a new opportunity had come up that his wife had found, which could make this very "profitable." REMBERT explained this did not even account for his building "ghost guns" on the side. REMBERT described how he would never stop making these types of firearms as long as he could obtain the parts. REMBERT elaborated about all of the firearms he made function. REMBERT stated he had only one malfunction out of 2,000 firearms. The UC understood REMBERT's remarks to convey that REMBERT manufactured/modified a high

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]
13

volume of firearms and considered it a lucrative business. REMBERT's remarks are also significant because he acknowledged that his firearms business is illegal (i.e., not legitimate).

39. Following the transaction, WALKER and F-1 provided plastic bags for the UC to place the firearms in that he/she had purchased.

### 4. June 2, 2021: Firearm Transaction with WALKER and REMBERT

40. In May of 2021, the UC communicated via text message with WALKER, and agreed to meet ultimately on or about May 27, 2021, to purchase several firearms and Glock conversion switches from WALKER and his associates. Prior to the meeting, WALKER advised the UC that the Glock conversion switches had not yet arrived from his source of supply (hereafter, "SOS"). They agreed to meet on another day the following week.

41. The UC continued to communicate with WALKER, and they agreed to meet on or about June 2, 2021, to complete the purchase of multiple firearms and Glock conversion switches. WALKER advised that he had the Glock conversion switches in his possession and was holding them for the UC.

42. On or about June 2, 2021, the UC and a second undercover agent (hereafter, "UC-2") met with WALKER and REMBERT at 1279 Linden Drive. The UC and UC-2 purchased the following items from WALKER: 10 Glock switches for $2,000; a privately manufactured P80 firearm with a Glock slide (SN: Obliterated) and Glock switch installed on it for $1,000; an Anderson Manufacturing AR-15 (Caliber: Multi, S/N: 19222950) for $1,500; and a Norinco SKS rifle (Caliber: 7.62x39, S/N: 22004052) for $1,200. Additionally, REMBERT sold them a Vulcan Mac-style handgun (Caliber: 9mm, S/N: G5775) for $1,200 and REMBERT gave a free Glock switch to UC-1.

### 5. July 14, 2021: Firearms Transaction with WALKER and REMBERT

43. In July of 2021, UC-1 communicated via text message with WALKER. They agreed to meet on or about July 14, 2021, so UC-1 could purchase a Glock model 48 handgun for $1,600, from WALKER. On such date, UC-2 met with REMBERT at 1279 Linden Drive. UC-2 purchased the following items from REMBERT at the address: a Glock model 48 handgun for $1,600, a Glock model 36 handgun for $1,400, and a Glock conversion switch for $200. REMBERT then charged $50 to install the Glock conversion switch on to the Glock model 36 pistol purchased by UC-2.

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
**[UNDER SEAL]**

14

### E. The Defendants Work Together to Market, Sell, and Manufacture Firearms via the Instagram Accounts

44. Through the investigation, law enforcement identified a second Instagram account associated with WALKER operated under the username of "alpha_armoury." On the original Instagram Account (i.e., "dippin_sideways"), WALKER (or one of his associates) posted a poll asking account followers whether he/they should start a second Instagram account to showcase their work building/altering custom firearms. Later, the Instagram account "alpha_armoury" was identified as connected to WALKER. Based on subpoena returns, the subscriber/user of the "alpha_armoury" account listed WALKER's telephone number, although the username was left as blank. This telephone number is the same one provided to the CI, as detailed above, and used by WALKER to communicate with the UC to negotiated firearms transactions.

45. Based on the totality of the investigation, I believe WALKER relies on and conspires with REMBERT, SINGH, and others to supply/facilitate their firearms trafficking operation. Further, I believe this illegal operation is conducted, in whole or in part, via the Instagram social media platform.

### V. REQUEST TO SEAL

46. The materials now before the Court—namely, this Affidavit and the accompanying and application for a search warrant—reveal sensitive details of an ongoing criminal investigation. Accordingly, in order to protect the integrity of that investigation, to guard against the flight of fugitives, and to better ensure the safety of agents and the public, I request that those materials—together with any search warrants that issue thereon—be sealed until further order of the Court, with the qualification that law enforcement agencies be authorized to share these materials as necessary to execute any warrants.

### VI. CONCLUSION

47. Based on the information set forth above, I submit that there is probable cause to believe that beginning on a date unknown, but no later than in or about October of 2020 (when Antioch PD began monitoring the dippin_sideways Instagram account), and continuing through at least August 9, 2021 (when I last observed a post on the dippin_sideways Instagram account, advising their customers that the package containing the items they ordered has not yet arrived), in the Northern District of

California and elsewhere, WALKER, REMBERT and SINGH agreed and conspired with each other to deal firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A).

48. Accordingly, based upon the foregoing, I respectfully request that the Court sign the requested criminal complaint and issue the requested arrest warrants.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

*Dillon Phillips*
DILLON PHILLIPS
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) this __10__ day of August, 2021.

*Virginia K. DeMarchi*
HONORABLE VIRGINIA K. DEMARCHI
United States Magistrate Judge

PHILLIPS AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]

16